**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| EMPIRE TECHNOLOGY DEVELOPMENT LLC, <br><br> Plaintiff, <br><br> v. <br><br> LENOVO GROUP LIMITED, LENOVO PC HK LTD., LENOVO (SHANGHAI) ELECTRONICS TECHNOLOGY CO. LTD., LENOVO (BEIJING) LIMITED, MOTOROLA MOBILE COMMUNICATION TECHNOLOGY LTD., and MOTOROLA (WUHAN) MOBILITY TECHNOLOGIES COMMUNICATION COMPANY LIMITED, <br><br> Defendants. | Case No. _____ <br><br> **DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Empire Technology Development LLC ("Empire") brings this action and makes the following allegations of patent infringement of U.S. Patent Nos. 8,798,120 (the "'120 Patent") and 8,565,331 (the "'331 Patent") (collectively, "patents-in-suit") against Defendants Lenovo Group Limited, Lenovo PC HK Ltd., Lenovo (Shanghai) Electronics Technology Co. Ltd., Lenovo (Beijing) Limited, Motorola Mobile Communication Technology Ltd., and Motorola (Wuhan) Mobility Technologies Communication Company Limited (collectively, "Lenovo", "Lenovo Defendants" or "Defendants") as follows:

## THE PARTIES

1.      Empire is a limited liability company organized and existing under the laws of the state of Delaware.

2.      Defendant Lenovo Group Limited ("Lenovo Group") is a corporation duly organized under the laws of Hong Kong, with its principal place of business at 23rd Floor, Lincoln House, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong S.A.R.

3.      Lenovo Group, together with its subsidiaries and affiliates, manufactures and sells computers and handheld devices worldwide, including throughout the United States and within Texas and the Eastern District of Texas, that infringe the patents-in-suit, and places such products into the stream of commerce via established distribution channels knowing or understanding that such products will be sold and used in the United States, including in this District.

4.      Officers or executives of Lenovo Group (and/or affiliates acting in concert with Lenovo Group) regularly work from and reside in the United States, including in Texas. These officers or executives include at least Laura Quatela, Matthew Zielinski (Austin, Texas)[1], Doug Fisher, and Arthur Hu. Upon information and belief, such officers or executives are involved in the marketing, distribution, sale, offer for sale, import, and use of the products that infringe one or more claims of the Patents-in-Suit, including those identified in detail in paragraphs 50-53 and 96 below ("Accused Products"), in the United States, as well as other acts of infringement alleged herein.

5.      Lenovo Group owns or controls, directly or indirectly, each of the Lenovo entities with which it coordinates the infringing sale, offer for sale, import, use, and manufacture of Accused Products in the United States. Lenovo Group operates and manages a global supply chain to develop, manufacture, and deliver Accused Products to the United States, including Texas and this District. At the direction or control of Lenovo Group, Accused Products are packaged,

---

[1] https://www.linkedin.com/in/matthew-zielinski/.

shipped, and sold to customers in the United States. Upon information and belief, Lenovo Group reports U.S. sales of the Accused Products as its own.

6.     Lenovo PC HK Ltd. ("Lenovo PC HK") is a company organized under the laws of Hong Kong. Lenovo PC HK has its principal place of business at 23rd Floor, Lincoln House, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong S.A.R.

7.     Lenovo PC HK, a subsidiary of Lenovo Group, is involved in the procurement, marketing, distribution, and sale of Accused Products. In particular, at the direction and control of Lenovo Group, Lenovo PC HK procures, makes, sells, offers for sale, imports, and uses Accused Products manufactured for the United States by other Lenovo entities, such as LCFC (Hefei) Electronics Technology Co., Ltd. d/b/a LC Future Center and Lenovo Compal Future Center ("LCFC Hefei") and Lenovo Centro Tecnológico S. de R.L. de C.V. ("Lenovo Centro"). That role includes providing manufacturers with designs and specifications of products that infringe the patents-in-suit destined for the United States.

8.     Lenovo PC HK has been and is involved in the shipping and importing of Accused Products into the United States—both directly and through intermediate Lenovo entities. Upon information and belief, Lenovo PC HK has sold and sells accused Lenovo products that infringe the patents-in-suit to at least one U.S. distributor that then sells them to Lenovo customers residing in the United States, including in the State of Texas and in this District. Lenovo PC HK acts in concert with and does the above activities at the instruction of Lenovo Group. Defendants are aware that the Accused Products sold in the United States are distributed throughout the United States, including in Texas and in this District.

9.     Defendant Lenovo (Shanghai) Electronics Technology Co., Ltd. ("Lenovo Shanghai") is a company organized under the laws of the People's Republic of China. Lenovo

Shanghai has an office at No. 68 Building, 199 Fenju Road, Wai Gao Qiao Free Trade Zone, Shanghai, 200131, China.

10.     Lenovo Shanghai, a subsidiary of Lenovo Group, has been and is involved in the manufacturing and distribution of Accused Products that are eventually sold to Lenovo PC HK and/or other Lenovo entities, who then sell and ship the Accused Products to at least one distributor in the United States. Lenovo Shanghai knows that the Accused Products it manufactures are intended for the United States market. Upon information and belief, Lenovo Shanghai has been and is involved of the shipping of Accused Products to the United States—both directly and through intermediate Lenovo entities.

11.     Lenovo (Beijing) Limited ("Lenovo Beijing") is a company organized under the laws of the People's Republic of China. Lenovo Beijing has its principal place of business at No. 6, Chuangye Road, Shangdi, Haidian District, Beijing 100085, China.

12.     Lenovo Beijing is a subsidiary of Lenovo Group. Upon information and belief, Lenovo Beijing acts in concert with, and under the direction and control of, Lenovo Group and/or Lenovo PC HK to sell, offer for sale, import, use, and make the Accused Products in the United States. For example, Lenovo Beijing is the registrant of www.lenovo.com, through which the Lenovo Defendants sell the Accused Products directly to customers in the United States. Lenovo Beijing further operates the "Beijing Data Center to support Lenovo global core business." Upon information and belief, Lenovo Beijing, operating in concert with Lenovo Defendants, hosts www.lenovo.com from the "Beijing Data Center."

13.     Motorola Mobile Communication Technology Ltd. ("Motorola Comm.") is a company organized under the laws of the People's Republic of China. Motorola Comm. has its

principal place of business at No. 999, Qishan North 2nd Road, Information & Optoelectronics Park, Torch Hi-tech Industry Development Zone, Xiamen, China.

14.    Motorola Comm. is a subsidiary of Lenovo Group. Upon information and belief, Motorola Comm. acts in concert with, and under the direction and control of, Lenovo Group and/or other Lenovo Group subsidiaries and/or affiliates to sell, offer for sale, import, use, and make the Accused Products in the United States.

15.    Motorola (Wuhan) Mobility Technologies Communication Company Limited ("Motorola Wuhan") is a company organized under the laws of the People's Republic of China. Motorola Wuhan has its principal place of business at No. 19, Gaoxin 4th Road, Donghu New Technology Development Zone Wuhan, Hubei, 430205 China.

16.    Motorola Wuhan is a subsidiary of Lenovo Group. Upon information and belief, Motorola Wuhan acts in concert with, and under the direction and control of, Lenovo Group and/or other Lenovo Group subsidiaries and/or affiliates to sell, offer for sale, import, use, and make the Accused Products in the United States, including mobile products.

17.    The Defendants identified in paragraphs 2 through 16 above are companies that together—with their subsidiaries and affiliates—comprise one of the world's leading manufacturers of computers, mobile phones, and related products. As of 2025, Lenovo is the world's largest supplier of personal computers—accounting for nearly a quarter of market share in the PC market in fiscal years 2024/2025.[2] Lenovo has a global reach and a strong presence in the United States. Lenovo has approximately 77,000 employees worldwide,[3] including in the United States, with many people in the United States in management, design, engineering,

---

[2] https://doc.irasia.com/listco/hk/lenovo/annual/2025/ar2025.pdf at 5.
[3] https://www.lenovo.com/us/en/about/?orgRef=https%253A%252F%252Fwww.google.com%252F.

marketing, and supply chain. Lenovo generated more than $69 billion in revenue in the 2024/2025 fiscal year,[4] a substantial portion of which is generated in the United States each year. Lenovo maintains one of its dual headquarters in the United States.[5]

18.    Together, Defendants, acting in consort with one another, design, manufacture, use, import into the United States, sell, and/or offer for sale in the United States computer devices, mobile phones, and other related products. Lenovo's devices are marketed, offered for sale, and/or sold throughout the United States, including within this District. Upon information and belief, Lenovo does business in Texas, directly or through intermediaries, and offers its products and/or services, including those accused herein of infringement, to customers and potential customers located in Texas, including in the Eastern District of Texas.

19.    Lenovo advertises that it manufactures most of its products in its own facilities, rather than through third parties. For example, on its website, Lenovo states: "Ranked #8 in the Gartner Supply Chain Top 25, we serve more than 180 markets and manufacture the majority of our products in our own facilities. This hybrid model helps us bring new innovations to market efficiently while having greater control over product development and global supply chain for advantages in quality, security, and time-to-market."[6] On May 28, 2024, Lenovo posted a press release on its website stating that Gartner ranked it #10 on their list of Supply Chain Top 25 for 2024 report. In the press release, Lenovo stated: "Today, Lenovo's global hybrid manufacturing network includes 30+ manufacturing sites spanning 10 markets in the 180 markets Lenovo does

---

[4] https://doc.irasia.com/listco/hk/lenovo/annual/2025/ar2025.pdf at 4.
[5] https://www.lenovo.com/us/en/about/locations/.
[6] https://www.lenovo.com/il/en/about/what-we-do/?orgRef=https%253A%252F%252Fwww.google.com%252F&srsltid=AfmBOoo2lw6RgK-4ruZx9uK499lmxr84J82A5Er4VTZqtt7QVGIpXbH5.

business in including Argentina, Brazil, China, Germany, Hungary, India, Japan, Mexico, *and the US*. This ensures the supply chain remains resilient and can adapt to any disruption."[7] The Lenovo Defendants named above and their subsidiaries and affiliates are part of the same corporate structure and distribution chain for the making, importing, offering to sell, selling, and using of the accused devices in the United States, including in Texas generally, and this District in particular. Defendants engage in coordinated and concerted action to direct the Accused Products throughout the United States, including Texas.

20.     Upon information and belief, the Lenovo Defendants named above and their subsidiaries and affiliates share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and product lines, including those accused herein of infringement and products involving related technologies.

21.     Lenovo Group, and Lenovo as a whole, holds itself out as the entity that manufactures, sells, offers to sell, imports, and uses the Accused Products in the United States, including Texas. For example, in the promotional materials, manuals, guides, terms of use, sales agreements, warranties, or similar documentation related to the Accused Products, the Lenovo Defendants regularly omit which specific Lenovo company or entity is responsible for the documents or associated products, or instead identify "Lenovo" or the "Lenovo Group." Similarly, the privacy statement of www.lenovo.com states that it "applies to data collected through websites owned and operated by Lenovo Group Ltd. and its affiliated group companies including Motorola ('Lenovo')."[8] Lenovo sells and offers for sale products through its U.S. website, and "Lenovo"

---

[7] https://news.lenovo.com/pressroom/press-releases/gartner-supply-chain-top-25-for-2024/ (emphasis added).
[8] https://www.lenovo.com/us/en/privacy.

(i.e., "Lenovo Group Limited and its affiliated group companies") imposes the terms of a "Lenovo Sales Agreement" on all customers, including customers within the United States, Texas, and this District.[9] Lenovo Group, and Lenovo as a whole, sells the Accused Products directly to customers in the United States, including within Texas, through www.lenovo.com/us/en. As a result, customers of the Accused Products understand that Lenovo Group and/or the Lenovo entities as a whole, including the entities named as defendants herein, make and sell the Accused Products.

## JURISDICTION AND VENUE

22.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this is a civil action arising under the Patent Act.

23.     This Court has personal jurisdiction over Defendants in this action consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. Defendants have committed acts within Texas (and this District) giving rise to this action and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants, directly and/or through subsidiaries or intermediaries, have committed and continue to commit acts of infringement in this District by, among other things, making, using, importing, offering to sell and/or selling products that infringe the patents-in-suit. Defendants, acting alone and in consort with one another, have purposefully directed activities at the United States, in particular, directing the Accused Products into the stream of commerce via established distribution

---

[9] https://www.lenovo.com/medias/Sales-Terms-and-Conditions-US.html?context=bWFzdGVyfHJvb3R8MTMzNzV8dGV4dC9odG1sfGg3MC9oYWMvOTQ0MTA1NTgwMTM3NC5odG1sfDgwM2RjYzkxMzNhYWYzOTJiNGEwZjU1ZjFhMWZkOGM5M2JhYzVmYTkwNzQ2OTk0ZWE5NjVkOWZiMWYwNzdhZmE.

channels knowing or understanding that such products would be sold and used in the United States, including in the Eastern District of Texas. Defendants have derived substantial revenue from infringing acts in the United States, which necessarily includes infringing acts in Texas and in this District, including from the sale and use of infringing products.

24.    Courts in Texas have concluded that Lenovo is subject to personal jurisdiction in the State of Texas. *See, e.g., Eireog Innovations Ltd. v. Lenovo Grp. Ltd*., No. 2:24-CV-00239-JRG, 2024 WL 4519763, at *6 (E.D. Tex. Oct. 16, 2024) ("[T]he Court finds that the exercise of personal jurisdiction over [Lenovo Group] is both reasonable and fair."); *ACQIS LLC v. Lenovo Grp. Ltd.*, 572 F. Supp. 3d 291, 307 (W.D. Tex. 2021) ("[T]his Court finds that the exercise of personal jurisdiction over [Lenovo Group] is both reasonable and fair."); *see also AX Wireless LLC v. Lenovo Grp. Ltd.*, No. 2:22-cv-00280-RWS-RSP, Dkt. No. 110 (report and recommendation) (E.D. Tex. Sept. 6, 2023) ("[E]xercising personal jurisdiction [over Lenovo Group] would not offend traditional notions of fair place and substantial justice.").

25.    In addition, or in the alternative, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

26.    Venue is proper in this District under 28 U.S.C. §§ 1391(c)(3) and/or 1400(b). Defendants, directly and/or through subsidiaries and intermediaries, have transacted business in this District and have committed acts of direct infringement in this District by, among other things, making, using, offering to sell, selling, and importing products that infringe the patents-in-suit. Lenovo has a regular and established place of business in this District, including, without limitation, through authorized sellers and sales representatives that offer and sell products that infringe the patents-in-suit throughout the State of Texas, including in this District, and to consumers throughout this District. Venue is also proper because Defendants are foreign

corporations that do not reside in the United States and, thus, may be sued in any judicial district in the United States. 28 U.S.C. § 1391(c)(3).

## THE ASSERTED PATENTS

27.    On August 5, 2014, the United States Patent and Trademark Office duly issued U.S. Patent No. 8,798,120, entitled "METHODS AND COMMUNICATION SYSTEMS HAVING ADAPTIVE MODE SELECTION." A true and correct copy of the '120 Patent is attached hereto as Exhibit A.

28.    The '120 Patent is directed to devices and methods for adaptive power adjustment of wireless transmissions, e.g., from a smartphone operating in a 5G cellular network.

29.    On October 22, 2013, the United States Patent and Trademark Office duly issued U.S. Patent No. 8,565,331, entitled "INSERTING AND DECODING REPLICATED DATA SYMBOLS IN WIRELESS COMMUNICATIONS." A true and correct copy of the '331 Patent is attached hereto as Exhibit B.

30.    The '331 Patent is directed to methods and devices for decoding a signal transmitted over a communications channel.

## BACKGROUND OF THE ACTION

31.    In 2009, researchers at the University of Texas devised ways to adaptively manage power when a cell phone transmits into a cellular network. This 2009 research later became the '120 Patent.

32.    The adaptive-power-control inventions embodied in the '120 Patent benefit today's smartphones in at least three valuable ways.

33.    First, adaptive control of transmission power prolongs battery life in smartphones. This is one of the core features that impacts buying decisions and is a feature that is continuously marketed by smartphone manufacturers.

34.     Second, adaptive control allows transmission at very high-power levels (for very short periods). Such high-power transmissions allow a device in a crowded network to access the best aspects of 5G-network technology and thereby dramatically improve performance.

35.     Third, adaptive power control allows smartphones to access 5G's benefits without creating a safety concern for the human user. FCC regulations strictly limit transmission-power levels to avoid overexposing a human head and body to elevated levels of radio frequency transmissions at close range.

36.     The '120 Patent's technology is important in the smartphone market, both today and during the future existence of at least 5G. The size of data transmissions from phones has increased with consumer demands driven by, e.g., social media. Smartphone manufacturers have only recently implemented sophisticated technology to adaptively control the power of transmissions from phones operating in cellular networks.

37.     Researchers at the University of Texas also devised ways to improve channel estimation by inserting and decoding replicated data while maintaining high data rates in cellular communications. This research later became the '331 Patent.

38.     Channel estimation is important in achieving reliable communication with high data rates in multiantenna systems.

39.     The '331 Patent's technology is important in the smartphone market, both today and during the future existence of at least 5G. The size of data transmissions from phones has increased with consumer demands driven by, e.g., social media. Smartphone manufacturers have only relatively recently implemented sophisticated technology for decoding replicated data in channel estimation for communications in cellular networks.

40.    The inventors of the patents-in-suit worked at the University of Texas at the time of the inventions and assigned all of their right, title and interest in and to patents-in-suit to The Board of Regents of The University of Texas System.

41.    Plaintiff's predecessor-in-interest, called Invention Development Management Company, LLC, financially and otherwise promoted and enabled the innovation and patenting that led to the patents-in-suit.

42.    Partially in recognition of those contributions, The Board of Regents of The University of Texas System granted an exclusive license that transfers all substantial rights in, to and under, *inter alia*, the patents-in-suit pursuant to a Master License Agreement effective as of June 26, 2009.

43.    Empire is the exclusive licensee under the Master License Agreement by virtue of an assignment of this Master License Agreement to Empire pursuant to an Assignment and Assumption Agreement effective as of June 5, 2017.

44.    Empire is the exclusive licensee of, and has all substantial rights in, to and under, the patents-in-suit, including the exclusive right to take all actions necessary to enforce the patents-in-suit, including the filing of this patent infringement lawsuit. Empire has the right to seek and recover all damages for past, present, and future infringement of the patents-in-suit and to seek injunctive relief as appropriate under the law.

45.    For example, Section 3.3(b) of the Master License Agreement grants to Empire the right to all of the following:

> Causes of action and enforcement rights of any kind (whether such claims, causes of action or enforcement rights are known or unknown; currently pending, filed, to be filed; or otherwise) under the Patents and/or under or on account of any of the Patents for past, current and future infringement of the Patents, including without limitation, all rights to (i) pursue and collect damages, profits and awards of whatever nature recoverable….

46. Section 6.1 of the Master License Agreement states, in pertinent part, as follows:

Licensee and its Affiliates will have the exclusive right, but not the obligation, to, in Licensee's own name and at Licensee's expense (or in the name and expense of an Affiliate of Licensee), institute, prosecute, and control any action or proceeding with respect to Infringement of the Patents…

47. In addition, Section 6.2 of the Master License Agreement states, in pertinent part, as follows:

This Agreement transfers to Licensee all substantial rights under the Patents and, as a result, Licensee has the right to bring any future action or proceeding to enforce claims under the Patents in its own name, without naming Licensor as a party thereto.

## COUNT I

### (Infringement of U.S. Patent No. 8,798,120)

48. Empire incorporates herein by reference paragraphs 1 through 47 above as if set forth in full.

49. Defendants design, manufacture, use, sell, import, and/or offer for sale in the United States products comprising adaptive control of transmission power.

50. Lenovo released the Flex 5G laptop in the U.S. on or about January 6, 2020, marking Lenovo's first known infringement.

51. Since on or about January 6, 2020, Lenovo released the following smartphones: Edge series of smartphones, including the Edge, Edge Plus, Edge 20, Edge 20 Pro, Edge 30, Edge 30 Pro, Edge 30 Ultra, Edge 30 Fusion, Edge 30 Neo, Edge 40 Pro, Edge 50, Edge 50 Pro, and Edge 50 Ultra models; Moto series of smartphones, including the Moto G 5G, Moto G 5G Plus, Moto G Stylus 5G, Moto G100, Moto G200 5G, Moto G34, Moto G50, Moto G51 5G, Moto G53, Moto G53Y, Moto G62 5G, Moto G71 5G, Moto G-75, Moto G82, Moto G84, and MotoG85; One series of smartphones including the One 5G and One 5G Ace; Razr series of smartphones, including the Razr 40, Razr 50 Ultra, Razr 5G, Razr 60 Ultra, and Razr+ 2025; the ThinkPhone

series of smartphones; and the Lenovo Legion series of smartphones, including the Lenovo Legion 2 Pro.

52.    Since on or about January 6, 2020, Lenovo released the following tablets: Tab 6, Tab M10 5G, Tab P12 Pro, Yoga Tab 13, and ThinkBook Plus G5 Tab.

53.    Lenovo's products that include, e.g., transmitters with Smart Transmit$^{TM}$, Smart Transmit$^{TM}$ 2.0, or Smart Transmit$^{TM}$ 3.0 technology infringe at least claim 25 of the '120 Patent. At least all 5G-compatible Lenovo phones, tablets, and computers identified above that include Smart Transmit$^{TM}$, Smart Transmit$^{TM}$ 2.0, or Smart Transmit$^{TM}$ 3.0 technology infringe the '120 Patent, including the Accused Products made in the United States, used in the United States, sold in the United States, offered for sale in the United States, or imported into the United States (the "'120 Patent Infringing Products").

54.    The '120 Patent Infringing Products feature Lenovo technologies and equipment operatively connected to and/or working with Smart Transmit technology and, thus, infringe the '120 Patent.

55.    Defendants have infringed and continue to infringe the '120 Patent, including at least claim 25 of the '120 Patent, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, offering to sell, selling, exporting from, and/or importing into the United States the '120 Patent Infringing Products, without authority or license.

56.    Defendants indirectly infringe the '120 Patent, including at least claim 25 of the '120 Patent, pursuant to 35 U.S.C. § 271(b), by (among other things) and with specific intent or willful blindness, actively aiding and abetting infringement by others, such as Defendants' customers and end-users, in this District and elsewhere in the United States. For example, Defendants' customers and end-users directly infringe through their use of the inventions claimed

in the '120 Patent. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the '120 Patent Infringing Products, and providing instructions, documentation, and other information to customers and end-users instructing them to use the '120 Patent Infringing Products in an infringing manner, including (i) instruction, technical support and services, (ii) training, marketing, product manuals, and advertisements, and (iii) software and mobile applications providing the foregoing and enabling customers and end-users to use the '120 Patent Infringing Products in an infringing manner. As a result of Defendants' inducement, Defendants' customers and end-users use the '120 Patent Infringing Products in the way that Defendants intend and that directly infringes the '120 Patent. Lenovo has known of the '120 Patent, and that the '120 Patent Infringing Products infringe the '120 Patent, or has been willfully blind to such infringement, since at least May 2019. Despite this knowledge of the '120 Patent and that the '120 Patent Infringing Products infringe the '120 Patent, Defendants have continued to perform these affirmative acts with the intent, or willful blindness, that the induced acts directly infringe the '120 Patent.

57.    Defendants also indirectly infringe the '120 Patent, including at least claim 25 of the '120 Patent, pursuant to 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the '120 Patent Infringing Products and causing the '120 Patent Infringing Products to be manufactured, used, sold, and offered for sale, contribute to Defendants' customers' and end-users' use of the '120 Patent Infringing Products, such that the '120 Patent is directly infringed. The '120 Patent Infringing Products are a material part of the invention of the '120 Patent, are not a staple article or commodity of commerce, have no substantial non-infringing use,

and are known by Defendants to be especially made or adapted for use in the infringement of the '120 Patent. Lenovo has known of the '120 Patent, and that the '120 Patent Infringing Products infringe the '120 Patent, or has been willfully blind to such infringement, since at least May 2019. Despite this knowledge of the '120 Patent and that the '120 Patent Infringing Products infringe the '120 Patent, Defendants have continued to perform these affirmative acts with knowledge of the '120 Patent and with intent, or willful blindness, that they cause the direct infringement of the '120 Patent.

58.    Claim 25 of the '120 Patent is reproduced below with the addition of labels [a], [b], [c], [d], and [e] corresponding to portions of the claim.

25. A mobile station for use in a communications system comprising:

[a]    a first antenna and a second antenna;

[b]    first circuitry coupled to the first antenna and configured to process signals for transmission by the first antenna; second circuitry coupled to the second antenna and configured to process signals for transmission by the second antenna; and

[c]    a controller coupled to the first and second circuitry, wherein the controller is configured to receive a control signal and, in accordance with the control signal, to select between a multiple-input multiple-output (MIMO) mode wherein both the first and second antennas transmit data over a communications channel and a single-input multiple-output (SIMO) mode wherein only one of the first and second antennas transmit data over a communications channel,

[d] wherein the control signal is based, at least in part, on a power consumption of the first and second circuitry,

[e] wherein the control signal is based, at least in part, on an idle power consumption of the mobile station.

59. The '120 Patent Infringing Products embody each and every limitation of at least claim 25 of the '120 Patent, literally or under the doctrine of equivalents, as described in the non-limiting examples set forth below concerning the Flex 5G. These non-limiting examples are preliminary and are not intended to limit Empire's right to modify these non-limiting examples or allege that other aspects of the Defendants' mobile devices, or other of Defendants' mobile devices or other products, infringe the identified claim, or any other claims, of the '120 Patent, including after a final written decision from the Patent Trial and Appeal Board in IPR2024-00896.

**"25.    A mobile station for use in a communications system comprising:"**

60. The '120 Patent Infringing Products are examples of mobile stations for use in a cellular network communication system.

61. For example, the Flex 5G is an example of a mobile station for use in a cellular network communication system. Specifically, below are photographs of a Flex 5G mobile station submitted by Lenovo to the FCC.

1.    **External Photograph of EUT**

Brand Name: Lenovo / Model Name: Lenovo Flex 5G 14Q8CX05********, 82AK********, Yoga 5G 14Q8CX05********, 81XE******** (* = 0~9, A~Z, a~z, "-" or blank, for marketing use only, with no impact on RF compliance of the product)



https://fcc.report/FCC-ID/O57FLEX5G14X05/4698089 at 1.

Brand Name: Lenovo / Model Name: Lenovo Flex 5G 14Q8CX05*********, 82AK*********, Yoga 5G 14Q8CX05*********, 81XE********* (* = 0~9, A~Z, a~z, "-" or blank, for marketing use only, with no impact on RF compliance of the product)



https://fcc.report/FCC-ID/O57FLEX5G14X05/4698089 at 7.

### "[a]     a first antenna and a second antenna;"

62.     The '120 Patent Infringing Products include at least a first antenna and a second antenna.

63.     For example, the Flex 5G includes at least a first antenna and a second antenna.

64.     Lenovo's submissions to the FCC for the Flex 5G indicate that the Flex 5G transmits multiple beams.[10]

65.     Below is an image from Lenovo's submission to the FCC of a User Guide for the Flex 5G. The User Guide shows antenna locations, including for "Wireless WAN antennas."

---

[10] *See, e.g.*, https://fcc.report/FCC-ID/O57FLEX5G14X05/4629699.pdf at 65–66.



https://fcc.report/FCC-ID/O57FLEX5G14X05/4629849.pdf at 2.

66.     Below are other images Lenovo submitted to the FCC for the Flex 5G showing antenna locations.

**15.** *Antenna Location*

**<For Tablet>**



The separation distance for antenna to edge:

| Antenna | To Edge1 (mm) | To Edge2 (mm) | To Edge3 (mm) | To Edge4 (mm) |
|---|---|---|---|---|
| WWAN Antenna 1 | ≤ 25mm | ≤ 25mm | >25mm | >25mm |
| WWAN Antenna 3 | ≤ 25mm | >25mm | >25mm | ≤ 25mm |
| WLAN/BT Antenna 1 | >25mm | >25mm | ≤ 25mm | >25mm |
| WLAN Antenna 2 | >25mm | >25mm | ≤ 25mm | >25mm |

https://fcc.report/FCC-ID/O57FLEX5G14X05/4663033.pdf at 167.



https://fcc.report/FCC-ID/O57FLEX5G14X05/4663033.pdf at 168.

67.    The Flex 5G also includes millimeter wave antenna modules.[11] Internal photographs of the Flex 5G that Lenovo submitted to the FCC, including the photograph provided below, show, e.g., millimeter wave antennas in the Flex 5G.

---

[11] *See, e.g.*, https://fcc.report/FCC-ID/O57FLEX5G14X05/4629699.pdf at 63; https://fcc.report/FCC-ID/O57FLEX5G14X05/4629727.pdf at 5.

3.    **Internal Photograph of EUT**

Brand Name: Lenovo / Model Name: Yoga 5G 14Q8CX05********, 81XE********, Lenovo Flex 5G 14Q8CX05********, 82AK******** (* = 0~9, A~Z, a~z, "-" or blank, for marketing use only, with no impact on RF compliance of the product)



https://fcc.report/FCC-ID/O57FLEX5G14X05/4629832.pdf at 1.

**"[b]    first circuitry coupled to the first antenna and configured to process signals for transmission by the first antenna; second circuitry coupled to the second antenna and configured to process signals for transmission by the second antenna; and"**

68.    The '120 Patent Infringing Products include first circuitry coupled to the first antenna and configured to process signals for transmission by the first antenna and second circuitry coupled to the second antenna and configured to process signals for transmission by the second antenna.

69.    For example, the Flex 5G includes first circuitry coupled to the first antenna and configured to process signals for transmission by the first antenna and second circuitry coupled to

the second antenna and configured to process signals for transmission by the second antenna. More specifically, e.g., the below internal photograph of the Flex 5G that Lenovo submitted to the FCC shows modules and circuitry for processing signals in the Flex 5G.[12]



70. One of Defendants' suppliers states that its second-generation RF front-end (RFFE) solutions for 5G multi-mode mobile devices represent a comprehensive RF solution designed to work with the new Snapdragon™ X55 5G modem, delivering a comprehensive modem-to-antenna

---

[12] https://fcc.report/FCC-ID/O57FLEX5G14X05/4629832.pdf at 1; *see also* https://download.lenovo.com/consumer/mobiles_pub/flex_5g_hmm_202005.pdf at 24-25, 34-37 (providing instructions for removing the 5G module and antenna modules in the Flex 5G); https://support.lenovo.com/us/en/solutions/ht510612-removal-and-replacement-videos-yoga-5g-81ak-flex-5g-81xe.

system for high-performance 5G mobile devices supporting both sub-6 GHz and millimeter wave (mmWave) bands. These RFFE solutions comprise power amplifiers and diversity modules that include the following:

- PA modules which pair with QET6100 to support 100 MHz 5G envelope tracking. QPM6585, QPM5677 and QPM5679 for bands n41, n77/78 and n79 respectively.

- Mid/High-band 5G/4G PA module QPM5670 features integrated LNA, switch, filters and 5G hexaplexer.

- Low-band 5G/4G PA module QPM5621 with integrated LNA, switch and filters, and support for low-band/low-band carrier aggregation and dual connectivity.

- Diversity module family QDM58xx, featuring integrated 5G/4G LNA, switch and filters for receive diversity and MIMO support for sub-6 GHz bands.

https://www.qualcomm.com/news/releases/2019/02/qualcomm-announces-second-generation-5g-rf-front-end-solutions-sleeker-more.

**"[c]    a controller coupled to the first and second circuitry, wherein the controller is configured to receive a control signal and, in accordance with the control signal, to select between a multiple-input multiple-output (MIMO) mode wherein both the first and second antennas transmit data over a communications channel and a single-input multiple-output (SIMO) mode wherein only one of the first and second antennas transmit data over a communications channel,"**

71.    The '120 Patent Infringing Products include a controller coupled to the first and second circuitry, wherein the controller is configured to receive a control signal and, in accordance with the control signal, to select between a MIMO mode wherein both the first and second antennas transmit data over a communications channel and a SIMO mode wherein only one of the first and second antennas transmit data over a communications channel.

72.    For example, the Flex 5G includes a controller coupled to the first and second circuitry and configured to receive a control signal and, in accordance with the control signal, to

select between a MIMO mode wherein both the first and second antennas transmit data over a communications channel and a SIMO mode wherein only one of the first and second antennas transmit data over a communications channel. Specifically, the Flex 5G includes a Snapdragon 8cx and Snapdragon X55 modem.[13] For example, the control signal received by the Flex 5G may include a DCI signal, which includes a MIMO or SIMO mode selection.

73.    As another example, the '120 Patent Infringing Products include a controller that is configured to select between a MIMO mode wherein both the first and second antennas transmit data over a communications channel and a SIMO mode wherein only one of the first and second antennas transmit data over a communications channel at least because they are compatible with LTE Release 12:

| Uplink Transmission modes in LTE Release 12 | | | |
|---|---|---|---|
| Transmission modes | Description | DCI (Main) | Comment |
| 1 | Single transmit antenna | 0 | single antenna port (port 10) |
| 2 | Closed-loop spatial multiplexing | 4 | 2 or 4 antennas (ports 20 and 21) (ports 40,41,42,43) |

**SIMO Mode** →
**MIMO Mode** →

Table 6: The two uplink transmission modes in LTE Release 12.

https://cdn.rohde-schwarz.com/pws/dl_downloads/dl_application/application_notes/1ma186/1MA186_2e_LTE_TMs_and_beamforming.pdf (annotated).

---

[13] https://www.lenovo.com/us/en/p/laptops/ideapad/ideapad-flex-series/lenovo-flex-5g-14q8cx05/88lgf801419?orgRef=https%253A%252F%252Fwww.google.com%252F&srsltid=AfmBOopK4vsa7i4YMFFFVDRVFfL3SbPc8n1ITidswp8CumCAeu3Z3QC8#features; https://www.lenovo.com/us/en/p/laptops/ideapad/ideapad-flex-series/lenovo-flex-5g-14q8cx05/88lgf801419?orgRef=https%253A%252F%252Fwww.google.com%252F&srsltid=AfmBOopK4vsa7i4YMFFFVDRVFfL3SbPc8n1ITidswp8CumCAeu3Z3QC8#tech_specs.

**"[d]     wherein the control signal is based, at least in part, on a power consumption of the first and second circuitry,"**

74.     Smart Transmit technology incorporated into the '120 Patent Infringing Products, including the Flex 5G, includes a control signal based, at least in part, on a power consumption of the first and second circuitry.

75.     For example, with Smart Transmit technology, transmit power may exceed the average power limit at certain times and transmit power may be less than the average power limit at other times, as shown below.



https://www.youtube.com/watch?v=KUh7NllpSZw.

76.     Smart Transmit "takes advantage of modem-to-antenna system awareness to optimize uplink speeds while complying with RF transmitter power limits. Higher transmit power helps extend coverage and improve uplink speeds."[14]

77.     A Lenovo submission to the FCC for the Flex 5G describes Smart Transmit as follows:

---

[14] https://www.youtube.com/watch?v=KUh7NllpSZw.

> [Smart Transmit] controls the instantaneous transmitting power for WWAN transmitter[s] []to ensure the product in compliance with FCC RF exposure limit over a defined time window, for SAR (transmit frequency ≤ 6GHz) and power density (transmit frequency > 6GHz) . . . to control and manage transmitting power in real time and to ensure at all times the time-averaged RF exposure is compliant to the regulation requirement.

https://fcc.report/FCC-ID/O57FLEX5G14X05/4657783.pdf at 4.

78.    Another Lenovo submission to the FCC for the Flex 5G describes Smart Transmit as follows:

> The Smart Transmit algorithm maintains the time-averaged transmit power, in turn, time-averaged RF exposure of SAR_design_target or PD_design_target, below the predefined time-averaged power limit (i.e., input.power.limit for 5G mmW NR), for each characterized technology and band. . . .
>
> Smart Transmit allows the device to transmit at higher power instantaneously, as high as Pmax, when needed, but enforces power limiting to maintain time-averaged transmit power to Plimit.

https://fcc.report/FCC-ID/O57FLEX5G14X05/4663033.pdf at 21.

79.    Moreover, at least certain implementations of Smart Transmit operate across multiple antenna groups:

> . . . Smart Transmit uses advanced techniques to intelligently manage transmit power across multiple antenna groups, enabling significantly extended coverage, improved uplink speeds, and lower latency — especially important to meet the high expectations for today's 5G devices and networks, all while ensuring devices remain compliant with regulatory requirements.

https://www.qualcomm.com/news/onq/2022/02/16/meet-inventor-behind-qualcomm-smart-transmit-breakthrough-technology-optimizes.

80.    The Snapdragon X55 modem employs envelope tracking technology[15] described as follows:

---

[15] https://www.qualcomm.com/products/technology/modems/snapdragon-x55-5g-modem; https://www.qualcomm.com/news/onq/2019/02/meet-snapdragon-x55-worlds-most-advanced-commercial-5g-modem; https://www.qualcomm.com/news/onq/2020/04/how-qualcomm-snapdragon-5g-modem-rf-system-unlocks-superior-performance.

The QET6100 extends envelope tracking technology to the wide 100 MHz uplink bandwidth and 256-QAM modulation needed for 5G NR, previously considered unattainable. This can achieve up to double the power efficiency compared to the alternative average power tracking technology, enabling faster devices with long battery life, as well as significant improvements in network coverage and capacity – key considerations for network operators.

https://www.qualcomm.com/news/releases/2019/02/qualcomm-announces-second-generation-5g-rf-front-end-solutions-sleeker-more.

81.    In a radio frequency ("RF") signal, an envelope is the boundary outlining maximum amplitude variations over time. Envelope tracking technology enhances power amplifier efficiency by continuously adjusting the power amplifier voltage as a function of the envelope in the RF signal. For example, the amplifier increases voltage during peaks and decreases voltage for lower power levels.[16]

**"[e]    wherein the control signal is based, at least in part, on an idle power consumption of the mobile station."**

82.    Smart Transmit technology incorporated into the '120 Patent Infringing Products, including the Flex 5G, includes a control signal based, at least in part, on a transmission power of the transceiver during an idle time.

83.    Because Smart Transmit engages in time averaging of transmit power as explained above, Smart Transmit accounts for idle power consumption of the mobile station.

84.    Lenovo submitted a "RF Exposure Report" to the FCC in connection with the Flex 5G. The report indicates that power limit enforcement in Smart Transmit involves forcing the device's Tx (instantaneous transmit power) to transmit at a reserve level ($P_{reserve}$) to ensure the time-averaged Tx does not exceed the FCC limit.[17]

---

[16] https://www.everythingrf.com/community/what-is-envelope-tracking.
[17] https://fcc.report/FCC-ID/O57FLEX5G14X05/4629699 at 10, 13, 45.

85.    Lenovo's "RF Exposure Report" to the FCC in connection with the Flex 5G also includes the results of a test in which "the transmitting power kept the same [] level" greater than zero dBm as shown in the plot below "after the call was re-established."



https://fcc.report/FCC-ID/O57FLEX5G14X05/4629699 at 45.

86.    Defendants' infringement is willful. Empire's counsel contacted Lenovo about a portfolio of patents including the '120 Patent.

87.    On May 31, 2019, Steve Steger sent an email to Fergal Clarke at Lenovo that attached a summary of Empire's wireless patent portfolio being offered for sale that included the '120 Patent, a full asset list for the portfolio, and a proposed non-disclosure agreement.

88.    On July 2, 2019, Mr. Steger sent an email to Fergal Clarke following up to confirm that Mr. Clarke had received the offering materials.

89.    On August 8, 2019, Mr. Steger sent an email to Fergal Clarke following up and attaching an updated asset list that included the '120 Patent.

90.     No Defendant licensed or otherwise obtained rights to the patent, either as a standalone asset or as one of many patents in the portfolio.

91.     Without permission from or compensation to Empire, Defendants have sold—and continue to sell—very substantial numbers of '120 Patent Infringing Products in the U.S. based on the pioneering technology in the '120 Patent.

92.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '120 Patent. Empire has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for the infringement of the '120 Patent.

93.     As a result of Defendants' infringement of the '120 Patent, Empire has suffered monetary damages and seeks recovery in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants together with interest and costs as fixed by the Court.

## COUNT II

### (Infringement of U.S. Patent No. 8,565,331)

94.     Empire incorporates herein by reference paragraphs 1 through 93 above as if set forth in full.

95.     Defendants design, manufacture, use, sell, import, and/or offer for sale in the United States products with 5G-compatible modems that use channel estimation.

96.     Lenovo's products that operate within, e.g., a 5G cellular network infringe at least claim 1 of the '331 Patent. On information and belief, all 5G-compatible Lenovo devices infringe the '331 Patent, including, e.g., the Flex 5G (the "'331 Patent Infringing Products").

97.     Defendants have infringed and continue to infringe the '331 Patent, including at least claim 1 of the '331 Patent, pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of

equivalents, by making, using, offering to sell, selling, exporting from, and/or importing into the United States the '331 Patent Infringing Products, without authority or license.

98.     Defendants indirectly infringe the '331 Patent, including at least claim 1 of the '331 Patent, pursuant to 35 U.S.C. § 271(b), by (among other things) and with specific intent or willful blindness, actively aiding and abetting infringement by others, such as Defendants' customers and end-users, in this District and elsewhere in the United States. For example, Defendants' customers and end-users directly infringe through their use of the inventions claimed in the '331 Patent. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the '331 Patent Infringing Products, and providing instructions, documentation, and other information to customers and end-users instructing them to use the '331 Patent Infringing Products in an infringing manner, including (i) instruction, technical support and services, (ii) training, marketing, product manuals, and advertisements, and (iii) software and mobile applications providing the foregoing and enabling customers and end-users to use the '331 Patent Infringing Products in an infringing manner. As a result of Defendants' inducement, Defendants' customers and end-users use the '331 Patent Infringing Products in the way that Defendants intend and that directly infringes the '331 Patent. Lenovo has known of the '331 Patent, and that the '331 Patent Infringing Products infringe the '331 Patent, or has been willfully blind to such infringement, since at least May 2019. Despite this knowledge of the '331 Patent and that the '331 Patent Infringing Products infringe the '331 Patent, Defendants have continued to perform these affirmative acts with the intent, or willful blindness, that the induced acts directly infringe the '331 Patent.

99.     Defendants also indirectly infringe the '331 Patent, including at least claim 1 of the '331 Patent, pursuant to 35 U.S.C. § 271(c), by contributing to direct infringement committed by

others, such as customers and end-users, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, the '331 Patent Infringing Products and causing the '331 Patent Infringing Products to be manufactured, used, sold, and offered for sale, contribute to Defendants' customers' and end-users' use of the '331 Patent Infringing Products, such that the '331 Patent is directly infringed. The '331 Patent Infringing Products are a material part of the invention of the '331 Patent, are not a staple article or commodity of commerce, have no substantial non-infringing use, and are known by Defendants to be especially made or adapted for use in the infringement of the '331 Patent. Lenovo has known of the '331 Patent, and that the '331 Patent Infringing Products infringe the '331 Patent, or has been willfully blind to such infringement, since at least May 2019. Despite this knowledge of the '331 Patent and that the '331 Patent Infringing Products infringe the '331 Patent, Defendants have continued to perform these affirmative acts with knowledge of the '331 Patent and with intent, or willful blindness, that they cause the direct infringement of the '331 Patent.

100.    Claim 1 of the '331 Patent is reproduced below with the addition of labels [a], [b], [c], [d], [e], and [f] corresponding to portions of the claim.

1. A method of decoding a signal transmitted over a communications channel, the method comprising:

[a] receiving a pilot symbol over the communications channel;

[b] estimating a channel matrix of the communications channel based, at least in part, on the pilot symbol;

[c] receiving replicated data from multiple data streams transmitted over the communications channel;

[d] decoding the replicated data using the estimated channel matrix;

[e] generating an updated estimate of the channel matrix based, at least in part, on the replicated data; and

[f] decoding subsequently received signals over the communications channel using the updated estimate of the channel matrix.

101.    The '331 Patent Infringing Products embody each and every limitation of at least claim 1 of the '331 Patent, literally or under the doctrine of equivalents, as described in the non-limiting examples set forth below. These non-limiting examples are preliminary and are not intended to limit Empire's right to modify these non-limiting examples or allege that other aspects of the Defendants' mobile devices or other devices infringe the identified claim, or any other claims, of the '331 Patent.

**"A method of decoding a signal transmitted over a communications channel, the method comprising:"**

102.    The '331 Patent Infringing Products perform a method of decoding a signal transmitted over a communications channel.

103.    For example, the Flex 5G includes the Snapdragon 8cx chipset, which includes Snapdragon X55 modem, and decodes a signal transmitted over a communication channel.[18]

---

[18] https://www.lenovo.com/us/en/p/laptops/ideapad/ideapad-flex-series/lenovo-flex-5g-14q8cx05/88lgf801419?orgRef=https%253A%252F%252Fwww.google.com%252F&srsltid=AfmBOopK4vsa7i4YMFFFVDRVFfL3SbPc8n1ITidswp8CumCAeu3Z3QC8#features; https://www.lenovo.com/us/en/p/laptops/ideapad/ideapad-flex-series/lenovo-flex-5g-14q8cx05/88lgf801419?orgRef=https%253A%252F%252Fwww.google.com%252F&srsltid=AfmBOopK4vsa7i4YMFFFVDRVFfL3SbPc8n1ITidswp8CumCAeu3Z3QC8#tech_specs.

104.    The Snapdragon X55 modem "is designed to provide comprehensive support for 5G NR TDD and FDD" and also "features cutting-edge LTE features, including 24 spatial streams, 4x4 MIMO, and 1024-QAM."[19]

**"receiving a pilot symbol over the communications channel"**

105.    The '331 Patent Infringing Products perform the step of receiving a pilot symbol over the communications channel.

106.    For example, the Flex 5G, which includes a Snapdragon X55 modem, performs the step of receiving a pilot symbol over the communications channel.

107.    An engineer at a Lenovo supplier, Dr. Kiran Mukkavilli, stated as follows:

A good, up-to-date channel estimate is essential to supporting high data rates on wireless channels, and pilot signals are used to estimate that wireless channel, which varies with time. ***I came up with a pilot design based on periodic placement and staggering of pilot symbols both in frequency and over time, which became a fundamental structure in OFDM-based cellular systems in 4G and 5G. We then further expanded this pilot design in 5G to dynamically adapt the pilot pattern*** depending on a user's environment and mobility conditions….

https://www.qualcomm.com/news/onq/2022/09/how-qualcomm-inventor-dr--kiran-mukkavilli-helped-hash-out-the-f (emphasis added).

**"estimating a channel matrix of the communications channel based, at least in part, on the pilot symbol"**

108.    The '331 Patent Infringing Products perform the step of estimating a channel matrix of the communications channel based, at least in part, on the pilot symbol.

109.    For example, the Flex 5G, which includes a Snapdragon X55 modem, performs the step of estimating a channel matrix of the communications channel based, at least in part, on the pilot symbol.

---

[19] https://www.qualcomm.com/news/onq/2019/02/meet-snapdragon-x55-worlds-most-advanced-commercial-5g-modem.

110.    As noted above, Dr. Mukkavilli stated as follows:

***A good, up-to-date channel estimate is essential to supporting high data rates on wireless channels, and pilot signals are used to estimate that wireless channel, which varies with time***. I came up with a pilot design based on periodic placement and staggering of pilot symbols both in frequency and over time, which became a fundamental structure in OFDM-based cellular systems in 4G and 5G. We then further expanded this pilot design in 5G to dynamically adapt the pilot pattern depending on a user's environment and mobility conditions….

https://www.qualcomm.com/news/onq/2022/09/how-qualcomm-inventor-dr--kiran-mukkavilli-helped-hash-out-the-f (emphasis added).

111.    Moreover, as another example, 5G channel matrix estimation is based, at least in part, on a pilot symbol, e.g., see below:



https://www.youtube.com/watch?v=TZzTsPQJDRo&t=562s.    A demodulation reference signal (DM-RS) is an example of a pilot symbol that is used to estimate the radio channel.

112.    As yet another example, U.S. Patent No. 9,985,802 entitled "Channel Estimation Enhancements" states that a user equipment "apparatus generates a channel estimate based on the received pilot." U.S. Patent No. 9,985,802 at 20:11-12, Fig. 12.

**"receiving replicated data from multiple data streams transmitted over the communications channel"**

113.    The '331 Patent Infringing Products perform the step of receiving replicated data from multiple data streams transmitted over the communications channel.

114.    For example, the Flex 5G, which includes a Snapdragon X55 modem, performs the step of receiving replicated data from multiple data streams transmitted over the communications channel.

115.    Replicated data includes data within a resource block also used to improve or update the channel estimate.

116.    The Snapdragon X55 modem employs spatial diversity, which is described as follows:

> Spatial diversity is one of the fundamental benefits of MIMO technology. In brief, diversity aims at improving the reliability of the system by sending ***the same data across different propagation, or spatial, paths***.

> Spatial diversity evolves into a more complex concept, which is "spatial multiplexing." Now, not only are the diverse experiences of the over-air-channel utilized for performance improvements, but multiple messages can be transmitted simultaneously without interfering with one another since they are separated in space.

> To better visualize the concept of spatial multiplexing, think of a pipeline through which data is flowing between the base station and the phone on a mobile network. Envision a situation with one antenna on the base station and one on the phone – that allows for only so much data to flow. Now, by installing more antennas on either side with proper spatial separation (see illustration below), multiple virtual pipelines can be created in the space between phone and the base station. This creates multiple paths for more data to travel between the base station and mobile.

> By nature, this solution is very dynamic. With the continuous movement of the mobile user and changes in the surrounding environment, the mobile phone and the network require more advanced capabilities to continuously coordinate the link and manage the data transmission.



https://www.qualcomm.com/news/onq/2019/06/how-5g-massive-mimo-transforms-your-mobile-experiences (emphasis added).

**"decoding the replicated data using the estimated channel matrix"**

117.    The '331 Patent Infringing Products perform the step of decoding the replicated data using the estimated channel matrix.

118.    For example, the Flex 5G, which includes a Snapdragon X55 modem, performs the step of decoding replicated data using the estimated channel matrix.

119.    As noted above, Dr. Mukkavilli stated as follows:

*A good, up-to-date channel estimate is essential to supporting high data rates on wireless channels, and pilot signals are used to estimate that wireless channel, which varies with time*. I came up with a pilot design based on periodic placement and staggering of pilot symbols both in frequency and over time, which became a fundamental structure in OFDM-based cellular systems in 4G and 5G. We then further expanded this pilot design in 5G to dynamically adapt the pilot pattern depending on a user's environment and mobility conditions…

https://www.qualcomm.com/news/onq/2022/09/how-qualcomm-inventor-dr--kiran-mukkavilli-helped-hash-out-the-f (emphasis added).

120.    In 5G, the estimated channel matrix is used in decoding data, e.g., see below:



https://www.youtube.com/watch?v=TZzTsPQJDRo&t=562s.

121.    The "DMRS [demodulation reference signal] is a special type of physical layer signal which functions as a reference signal for decoding PDSCH [physical downlink shared channel]."[20]

122.    As another example, U.S. Patent No. 9,985,802 states that user equipment "decode[s] (e.g., demodulate[s]) received data based on the channel estimate." U.S. Patent No. 9,985,802 at 10:61-63.

**"generating an updated estimate of the channel matrix based, at least in part, on the replicated data"**

123.    The '331 Patent Infringing Products perform the step of generating an updated estimate of the channel matrix based, at least in part, on the replicated data.

124.    For example, the Flex 5G, which includes a Snapdragon X55 modem, performs the step of generating an updated estimate of the channel matrix based, at least in part, on the replicated data.

---

[20] https://www.sharetechnote.com/html/5G/5G_PDSCH_DMRS.html.

125. Examples of the data within a PDSCH resource block (RB) that are used in generating a channel estimate include data within an RB also used to improve or update the channel estimate. The PDSCH RB is replicated across at least two streams in a MIMO transmission.

**"decoding subsequently received signals over the communications channel using the updated estimate of the channel matrix"**

126. The '331 Patent Infringing Products perform the step of decoding subsequently received signals over the communications channel using the updated estimate of the channel matrix.

127. For example, and as explained above with reference to initial decoding based on an initial estimate of the channel matrix, the Flex 5G, which includes a Snapdragon X55 modem, performs the step of decoding subsequently received signals over the communications channel using the updated estimate of the channel matrix.

128. As another example, U.S. Patent No. 9,985,802 states that user equipment "decode[s] (e.g., demodulate[s]) received data based on the channel estimate." U.S. Patent No. 9,985,802 at 10:61-63.

129. Defendants' infringement is willful. Empire's counsel contacted Lenovo about a portfolio of patents including the '331 Patent.

130. On May 31, 2019, Steve Steger sent an email to Fergal Clarke at Lenovo that attached a summary of Empire's wireless patent portfolio being offered for sale that included the '331 Patent, a full asset list for the portfolio, and a proposed non-disclosure agreement.

131. On July 2, 2019, Mr. Steger sent an email to Fergal Clarke following up to confirm that Mr. Clarke had received the offering materials.

132.    On August 8, 2019, Mr. Steger sent an email to Fergal Clarke following up and attaching an updated asset list that included the '331 Patent.

133.    No Defendant licensed or otherwise obtained rights to the patent, either as a standalone asset or as one of many patents in the portfolio.

134.    Without permission from or compensation to Empire, Defendants have sold—and continue to sell—very substantial numbers of '331 Patent Infringing Products in the U.S. based on the pioneering technology in the '331 Patent.

135.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '331 Patent. Empire has satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for the infringement of the '331 Patent.

136.    As a result of Defendants' infringement of the '331 Patent, Empire has suffered monetary damages and seeks recovery in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants together with interest and costs as fixed by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Empire prays for a judgment in its favor and against Defendants and respectfully requests the following relief:

A.    A judgment in favor of Empire that Defendants infringe, either literally or under the doctrine of equivalents, the '120 and '331 Patents;

B.    Damages for infringement of the '120 and '331 Patents in an amount to be determined at trial;

C.    For other monetary relief, including costs, expenses, and pre- and post-judgment interest;

D.      An order pursuant to 35 U.S.C. § 283 enjoining Defendants, their officers, directors, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further acts of infringement of the '120 and '331 Patents;

E.      A determination that Defendants' infringement of the '120 and '331 Patents has been and is willful, and an award of enhanced damages, up to and including trebling of the damages awarded to Empire under 35 U.S.C. § 284;

F.      A determination that this is an exceptional case under 35 U.S.C. § 285 and an award of attorneys' fees and costs to Empire;

G.      An order awarding Empire any such other relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Empire hereby demands a jury trial as to all issues so triable.

Dated: August 21, 2025

Respectfully submitted,

_/s/ Elizabeth L. DeRieux_____
Elizabeth L. DeRieux
Texas State Bar No. 05770585
CAPSHAW DERIEUX, LLP
114 East Commerce Avenue
Gladewater, Texas 75647
(903) 845-5770
Email: ederieux@capshawlaw.com

Christopher J. Gaspar (*pro hac vice* to be submitted)
Nathaniel T. Browand (*pro hac vice* to be submitted)
MILBANK LLP
55 Hudson Yards
New York, NY 10001-2163
(212) 530-5000
Email: cgaspar@milbank.com
Email: nbrowand@milbank.com

*Attorneys for Plaintiff*
*Empire Technology Development LLC*